**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
      lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN BRANDEL, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>SIBANYE GOLD LIMITED, NEAL FRONEMAN, and CHARL KEYTER,<br><br>    Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Kevin Brandel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sibanye Gold Limited ("Sibanye" or the "Company"), and information readily obtainable on the Internet. Plaintiff

1

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Sibanye securities between April 7, 2017 and June 26, 2018, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Sibanye securities during the Class Period and was economically damaged thereby.

7. Defendant Sibanye operates as a precious metals mining company in South Africa, Zimbabwe, and the United States. Sibanye is incorporated and has its principal executive offices in the Republic of South Africa. Sibanye's sponsored ADRs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SBGL".

8. Defendant Neal Froneman ("Froneman") has served as the Company's Chief Executive Officer ("CEO") during the Class Period.

9. Defendant Charl Keyter ("Keyter") has served as the Company's Chief Financial Officer ("CFO") during the Class Period.

10. Defendants Froneman and Keyter are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

  (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

  (f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

  (g) approved or ratified these statements in violation of the federal securities laws.

12. Sibanye is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sibanye under *respondeat superior* and agency principles.

14. Defendants Sibanye and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

15. On April 7, 2017, Sibanye filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2016 (the "2016 20-F"). The 2016 20-F was signed by Defendant Keyter. The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Froneman and Keyter attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16. The Company stated in its 2016 20-F that it was committed to keeping its workforce safe, providing in relevant part:

> OUR APPROACH TO SAFETY, HEALTH AND WELLBEING
> Our employees are our most important asset. In order to keep our workforce safe and healthy, we focus on compliance and systematically reducing employees' exposure to risk. We are therefore committed to:
> - identifying and ranking risks
> - finding technical and procedural engineering solutions in terms of a risk mitigation hierarchy to eliminate risk completely, if possible
> - controlling risk at source
> - minimising risk factors
> - monitoring risk exposure
> - providing personal protective equipment

17. On April 2, 2018, Sibanye filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 20-F"). The 2017 20-F was signed by Defendant Keyter. The 2017 20-F contained signed SOX certifications by Defendants Froneman and Keyter attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18. The Company stated in its 2017 20-F that safety was "paramount," providing in relevant part:

> Safety is our principal value and we continue to focus significant effort and attention as well as resources on ensuring that our employees are able to work in a safe and conducive environment.
> * * *
> The safety, health and wellbeing of our employees, the most vital of our stakeholders, is paramount. In addressing these three aspects, our approach is based on Sibanye Stillwater's CARES values –commitment, accountability, respect, enabling and safety – and our safety, health and wellbeing tree.

19. The statements contained in ¶¶15-18 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

5

failed to disclose that: (1) Sibanye's culture places short-term profits over safety; (2) consequently, almost half of South Africa's 2018 mining fatalities occurred in Sibanye mines; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

20. On June 13, 2018, pre-market, *The Mercury* published an article entitled, "Mine puts profits before lives – claim," stating that Company supervisors forced and intimidated miners to work in dangerous conditions. The article states, in relevant part:

> **Mine puts profits before lives – claim**
> The Mercury 13 Jun 2018 Lindile Sifile and Mary Jane Mphahlele
>
> THE tragic deaths of four gold miners at a Johannesburg mine have been blamed on a shift manager, accused of putting profits before lives.
>
> ***Angry workers claimed that the manager forced them to work in an abandoned underground shaft where they choked to death from a combination of gas and poor ventilation.***
>
> The bodies of four miners have since been retrieved, while the fifth worker has not been accounted for. Rescue operations at Sibanye Gold's Kloof Ikamva shaft in Westonaria, west of Joburg, were still under way yesterday.
>
> The Department of Mineral Resources yesterday said it would meet the mine management to address the soaring deaths of mineworkers.
>
> The department's director-general, Thabo Mokoena, said: "We have been on site with the acting chief inspector of mines, who is currently at Sibanye. The minister, together with the department, will be meeting this week with Sibanye to see how we can deal with this challenge."
>
> The Association of Mineworkers and Construction Union (Amcu) was even more scathing when it said Sibanye Gold operations had become killing fields.
>
> "The union questions why a manager allegedly forced employees to go underground, even though the Department of Mineral Resources had reportedly issued an order to stop production.

6

"The shaft in question was reportedly ordered to be closed in terms of section 54 of the Mine Health and Safety Act because of excessive temperature and inadequate ventilation," said Amcu president Joseph Mathunjwa.

However, the company's spokesperson, Thabile Phumo, said the ban was only for a specific area in the shaft. She added that the area where the bodies were found was not sealed off, but there was a ventilation wall which prevented anyone from accessing it.

*"The workers were officially on duty when the incident happened. They were not separated, but they went into the area led by the supervisor of their team. We don't know why, but we will interview the safety rep who refused to go into that area," said Phumo.*

The company said it would investigate if the deceased were also working with illegal miners.

*The Mercury's sister newspaper, The Star, interviewed several miners from Shaft 4, where the incident took place, and they blamed their supervisors for allegedly bending the rules by forcing them to work in dangerous conditions.*

*They claimed that about two weeks ago another crew had refused to work in the same shaft, citing poor ventilation and unbearable heat.*

*The crew's supervisor and overseer were suspended as a result, and a new crew was brought in on Monday to work at the same shaft.*

*"The manager then asked the new crew of six to access the shaft. Their safety representative refused to go in because of the heat, which was above 37°C, while other guys went down unwillingly. They felt intimidated, that they would lose their jobs if they did not obey their bosses' orders," said a miner.*

*Sibanye Gold faced similar accusations of intimidation of workers when seven miners were killed in a seismic event at the company's Driefontein operations last month.*

*It was alleged that a shaft manager forced them to work less than two hours after ground shook not far from the area where the fatal seismic event occurred.*

During their memorial service, the company's chief executive, Neal Froneman, said workers would not be fired for refusing to work in dangerous places. "All employees have the right to withdraw from unsafe conditions, and we expect that right to be exercised responsibly whenever necessary. There is no excuse for ignoring unsafe conditions or behaviours," said Froneman at the time.

But National Union of Mineworkers (NUM) chairperson of the health and safety committee, Peter Bailey, yesterday said workers would be charged with insubordination if they refused to take orders from their superiors.

The unions have called on Mineral Resources Minister Gwede Mantashe to act decisively against mining houses that fail to ensure staff safety.

(Emphasis added.)

21.  On this news, shares of Sibanye fell $0.07 per share or 2.6% to close at $2.56 per share on June 13, 2018.

22.  On June 26, 2018, *Bloomberg* reported that "another worker was killed at [Sibanye's] Driefontein operation in South Africa, bringing the total deaths at the company's mines this year to 21." According to the article, Sibanye "accounts for nearly half of the 46 people reported killed at South African mines in 2018 and is already the subject of an investigation by the chief inspector of mines."

23.  On this news, shares of Sibanye fell $0.31 per share, or 10.99% to close at $2.51 per share, damaging investors.

24.  On June 27, 2018, *Bloomberg* reported pre-market that Citigroup Inc. cut their recommendation on the stock to neutral from buy, citing the Company's "track record" from both "an environmental, social and governance perspective, as well as the underlying investment risk that it holds[.]" The article stated, in relevant part:

**Sibanye's Rising Death Toll Exposes Investment Risk, Citi Says**

- Gold miner took unsustainable measures to boost profit: Citi
- Sibanye disputes Citi's analysis; plans risk-management study

By Felix Njini

(Bloomberg) -- Sibanye Gold Ltd.'s deteriorating safety record and rising death toll undermines its investment case and risks triggering intervention by the South African government, according to Citigroup Inc.

8

> *"We find it difficult to recommend that investors should buy a company with a track record like this, both from an environmental, social and governance perspective, as well as the underlying investment risks that it holds," Citi analysts Johann Steyn and Shashi Shekhar, said in a note on Wednesday. They cut their recommendation on the stock to neutral from buy.*
>
> The latest fatality, at the Khomanani operation on Tuesday, means Sibanye accounts for almost half of the 46 people killed at South African mines this year. The gold producer is already the subject of an investigation by the chief inspector of mines, and there is the potential for further action, Citi said.
>
> *"There is a real risk that the Department of Mineral Resources could intervene, which may have a negative impact on profits at a time when its balance sheet is already strained," the analysts said.*
>
> *Citi said it's concerned that Sibanye has taken "unsustainable short-term measures" to boost earnings, including cutting capital spending and reducing management oversight, as well as mining high-grade pillars that were previously considered "too dangerous" to exploit. Steyn declined to comment further.*

(Emphasis added.)

25. On this news, shares of Sibanye fell more than 8% during intraday trading on June 27, 2018, damaging investors.

26. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Sibanye securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Sibanye, members of the Individual Defendants' immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

28. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sibanye securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

29. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Sibanye;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Sibanye to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Sibanye' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

33. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Sibanye shares met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

- As a public issuer, Sibanye filed periodic public reports with the SEC and NYSE;

- Sibanye regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Sibanye was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

34. Based on the foregoing, the market for Sibanye securities promptly digested current information regarding Sibanye from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

35. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

36. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

38. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

12

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sibanye securities during the Class Period.

40. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Sibanye were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Sibanye, their control over, and/or receipt and/or modification of Sibanye's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sibanye, participated in the fraudulent scheme alleged herein.

41. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Sibanye personnel to members of the investing public, including Plaintiff and the Class.

42.     As a result of the foregoing, the market price of Sibanye securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Sibanye securities during the Class Period in purchasing Sibanye securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

43.     Had Plaintiff and the other members of the Class been aware that the market price of Sibanye securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Sibanye securities at the artificially inflated prices that they did, or at all.

44.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

45.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Sibanye securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

46.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47.     During the Class Period, the Individual Defendants participated in the operation and management of Sibanye, and conducted and participated, directly and indirectly, in the conduct of Sibanye's business affairs. Because of their senior positions, they knew the adverse

non-public information about Sibanye's misstatement of revenue and profit and false financial statements.

48.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sibanye's financial condition and results of operations, and to correct promptly any public statements issued by Sibanye which had become materially false or misleading.

49.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sibanye disseminated in the marketplace during the Class Period concerning Sibanye's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sibanye to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sibanye within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sibanye securities.

50.  By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sibanye.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)  declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 27, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
          lrosen@rosenlegal.com

*Counsel for Plaintiff*