UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

In re SIBANYE GOLD LTD. SECURITIES
LITIGATION

<u>**MEMORANDUM AND ORDER**</u>

--------------------------------------X

18-CV-3721(KAM)(PK)

This Document Relates to:

<u>CLASS ACTION</u>

ALL ACTIONS
--------------------------------------X

**MATSUMOTO, United States District Judge:**

   Defendants Sibanye Gold Limited ("Sibanye" or the "Company") and Neal Froneman move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint"). *See* Mot. to Dismiss ("Def. Mem."), ECF No. 46. Plaintiffs' Amended Complaint seeks remedies from Defendants pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). *See generally* Am. Compl., ECF No. 34. Defendants move to dismiss the Amended Complaint with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.* For the reasons discussed below, Defendants' motion to dismiss is granted in its entirety.

## BACKGROUND

The following facts, taken from Plaintiffs' Amended Complaint, documents known to and relied upon by Plaintiffs, and incorporated by reference into the Amended Complaint, and documents within the purview of judicial notice, are properly considered and assumed to be true for the purposes of Defendants' motion to dismiss. *See Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013) (citations omitted); *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that courts may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities Exchange Commission ("SEC"), and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *see also Garber v. Legg Mason Inc.*, 347 Fed. App'x 665, 669 (2d Cir. 2009) (noting that courts may consider the fact of press coverage for the purpose of establishing whether corporate information was publicly available).

## I.   The Parties

Plaintiffs each purchased Sibanye securities[1] during a

---

[1]     The securities at issue are Sibanye American Depositary Receipts ("Sibanye ADRs").

class period between February 23, 2017 through October 31, 2018, inclusive ("class period"), and allege to have suffered damages from Defendants' acts and omissions. Am. Compl. ¶¶ 1, 19-20.

Sibanye is a precious metals mining company in South Africa, Zimbabwe, and the United States. *Id.* ¶ 21. Sibanye is incorporated in, and mines deep deposits of gold in, South Africa. *Id.* ¶¶ 30-31, 42-43. Its principal executive offices are in Libanon, South Africa, at the site of its Kloof and Driefontein mines. *Id.* ¶ 21. Sibanye's securities trade on the New York Stock Exchange under the ticker symbol "SBGL". *Id.*

Neal Froneman was, at all relevant times, Chief Executive Officer of Sibanye. *Id.* ¶ 22. Froneman holds, among other degrees and certifications, a B.Sc. in Mechanical Engineering from the University of Witwatersrand, a Mine Engineer's Certificate of Competency, and a Mine Manager's Certificate of Competency. *Id.* He has served as Vice-President of the Minerals Council South Africa since 2013. *Id.* He is also a registered Professional Engineer. *Id.* He has worked in the mining industry for his entire 34-year career. *Id.*

During the class period, Froneman was privy to confidential and proprietary information concerning Sibanye's operations, finances, financial condition, and present and future business prospects, including mine safety and seismic reports that are the subject of the instant suit. *See id.* ¶ 202.

3

## II.  Other Relevant Sibanye Actors

Robert van Niekerk has served as Executive Vice President, Head of South Africa region for Sibanye since July 2017. *Id*. ¶ 24. Wayne Robinson has served as Executive Vice President and Head of Operations, South Africa Region, throughout the class period and has over 27 years of experience in underground mine management. *Id*. ¶ 25. Both are named executive officers in Sibanye's annual reports and report directly to Froneman. *Id.* ¶¶ 24-25.

William Henry Taylor served as Sibanye's Senior Vice President of Mining, Gold Division since May 2017, reporting to Robinson. *Id*. ¶ 26. Karabo Katake served as the mine manager in charge of the Masakhane shaft in the Driefontein mine in May 2018, during one of the incidents at issue in the complaint. *Id*. ¶ 27. The Masakhane shaft accounts for 7% of Sibanye's total South African gold output. *Id*.

## III. Procedural History

On June 27, 2018, individual plaintiff Kevin Brandel filed an initial putative class action complaint against Defendants. Compl., ECF No. 1. On December 17, 2018, the court appointed Plaintiffs as lead plaintiffs of the instant class action. ECF No. 27, Order. In the same order, the Rosen Law Firm, P.A. ("Rosen") and Pomerantz LLP ("Pomerantz") were appointed co-lead counsel for the putative class. *Id.* On April

4

8, 2019, Plaintiffs filed the Amended Complaint, which was filed pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) as a class action on behalf of all persons or entities who purchased Sibanye securities during the class period. Am. Compl. ¶ 182. On May 31, 2019, the court held a telephone pre-motion conference regarding Defendants' prospective motion to dismiss. Minute Entry dated May 31, 2019. At the pre-motion conference, Plaintiffs declined the court's offer to grant leave to file a second amended complaint to address Defendants' bases for their proposed motion, and potentially avoid motion practice. May 31, 2019 Pre-Mot. Conf. Transcript, ECF No. 57 at 4-5. On October 15, 2019, the parties filed Defendants' motion to dismiss, Plaintiffs' opposition, and Defendants' reply. *See* Def. Mem., ECF No. 47; Pl. Opp., ECF No. 49; Def. Reply, ECF No. 53. On April 17, 2020, the parties filed a joint letter advising that they would rest on their submissions and forego oral argument given the ongoing COVID-19 pandemic. *See* Joint Letter, ECF No. 58.

## IV.  The Amended Complaint

### A. Factual Allegations

Plaintiffs' allegations are based upon an investigation of, *inter alia*, Defendants' public documents, conference calls and announcements made by Defendants, SEC filings, newspaper reports, wire and press releases published by

and regarding Sibanye, publicly available information, internal documents, South African government investigations, and analysts' reports and advisories about the Company. Am. Compl. ¶ 1.

Gold mines in South Africa are heavily regulated, due both to inherent dangers and historical injustices. *Id.* ¶¶ 30, 35. First discovered in 1886 in the Witwatersrand Basin, the site of the future location of Johannesburg, gold brought European capital investment and contributed to the eventual development of apartheid for legal control of black South Africans as laborers. *Id.* ¶¶ 31-33. Historically, under apartheid, mine owners ignored safety in pursuit of profit as they treated their largely black workforce as expendable. *Id.* From 1971–1990, approximately 624 mostly black miners died from mining accidents. *Id.* ¶ 33. After the end of apartheid in the early 1990s, the post-apartheid government implemented laws to reduce miner deaths, including the Mine Health and Safety Act of 1996 ("MHSA" or "Act"). *Id.* ¶¶ 33-35.

The Act's Section 23 provides miners with the absolute right to leave a workplace whenever the miners believe and are reasonably justified in their belief that the workplace is unsafe ("Employee Section 23 Rights"). Likewise, Section 23 provides that health and safety representatives may direct employees to leave a dangerous working place ("Safety

6

Representative Section 23 Rights"). The Act also expressly prohibits employers from discriminating against employees for exercising their Section 23 Rights. *Id.* ¶ 35.

Mining is important to South Africa's economy, directly accounting for 7% of South Africa's GDP and indirectly supporting another 10%, and directly employing 3% of South Africa's workforce. *Id.* ¶ 36. Due to the importance of gold mining as an economic sector and the historical role it played during apartheid, it is a politically sensitive industry where politicians and companies alike must heed public concerns surrounding worker safety. *Id.*

In 2009, South Africa enacted the Mine Health and Safety Amendment Bill, which strengthened regulations, raised fine levels, and criminalized many violations of mining safety laws. *Id.* ¶ 37. South African mining companies further committed to reducing fatalities to zero by December 2020, in a program named "zero harm." *Id.* ¶ 38. The safety pledge included an agreement between the CEOs of South Africa's largest miners, including Sibanye, who agreed to meet quarterly to share and adopt new techniques to mine safely. *Id.* ¶ 39.

## 1. Sibanye

Sibanye was spun off from Gold Fields Limited in 2013, holding an interest in three groups of mines: 100% of the Beatrix Mines; 100% of the Kloof mines; and 37.3% of the

7

Driefontein mines. *Id.* ¶ 40. The Beatrix, Kloof, and Driefontein mines were Sibanye's core assets. *Id.* ¶ 42. All three mines are old and deep. *Id.* ¶ 41. The Beatrix mines have been in operation since 1985 and currently exploit deposits at depths of between 700 to 2,200 meters. *Id.* The Kloof and Driefontein mines have been in operation since 1952 and currently exploit deposits at depths of between 500 meters to 4,000 meters. *Id.* The three mines are important to Sibanye's profitability. *Id.* ¶ 42. In 2016 the three mines earned combined net profits of 4,120 million Rand, greater than Sibanye's total net profits of 3,042 million Rand. *Id.* In 2017, the mines earned combined profits of 951 million Rand even as Sibanye overall lost 4,433 million Rand. *Id.* In response to public skepticism and to boost investor confidence, Defendants touted Sibanye's strategy to exploit unmined gold seams in the mines that previous owners had deemed too difficult to access, of lower grade ore, or materially more dangerous to exploit. *Id.* ¶ 43.

Sibanye has grown through acquisitions. *Id.* ¶ 44. Sibanye's largest acquisition has been an American Platinum Group Metals ("PGM") mine, Stillwater Mining Co., for $2.2 billion, an amount greater than Sibanye's market capitalization at the time. *Id.* Sibanye was over $1.9 billion in debt as of December 31, 2017, a year in which Sibanye lost $358 million. *Id*. The cost of accessing the deep seams in the three South

8

African mines led Sibanye to cut costs, including in safety expenses. *Id.* Sibanye materially cut safety efforts to service its debt and remain in business. *Id.* ¶ 45. According to an analyst's investigation, among South African mining companies, Sibanye spends the second-least per employee on safety training. *Id.*

### 2. The Implementation of Sharp! Sharp! ("Sharp!") and the Drop in Miner Fatalities from 2016 – 2017

Defendants launched a mine safety program called "Sharp! Sharp!" ("Sharp!") in 2016 to address a spike in fatalities. *Id.* ¶ 3. Plaintiffs allege that Defendants made no progress towards their safety commitments before the Class Period, citing a Fatal Injury Rate per million hours worked of 0.10 in 2013, 0.12 in 2014, 0.06 in 2015, and 0.11 in 2016. *Id.* ¶ 47. Plaintiffs further allege that the 2015 safety improvement had been a "temporary blip." *Id.* ¶ 49. Sharp! was designed to change non-managerial mineworkers' culture. *Id.* For the foregoing reasons, Plaintiffs allege that Froneman knew that Sharp! was "illusory" and "fail[ed] meaningfully to address the conditions that put [Sibanye's] miners lives at risk." *Id.* ¶ 5.

Sibanye's 2016 and 2017 20-F, a form filed with the Securities and Exchange Committee by all foreign private issuers with listed equity shares on exchanges in the United States, included a lengthy description of Sharp! and its goals, setting

out clear short, medium and long term goals:

> ADDRESSING OUR SAFETY PERFORMANCE – SHARP! SHARP!
>
> A new safety campaign, known as "Sharp! Sharp!", was rolled out in 2016 to encourage safe behaviour, address the regression in our safety performance, counter the decline in the FIFR in the first half of the year and to reintroduce a culture of continuous improvement. This campaign includes short, medium and long-terms plans[.]
>
> **Short-term plans** initiated to refocus and re-energise [sic] our safety performance included:
>
> Restructuring the safety department by appointing a senior executive in the office of the CEO to spearhead our health and safety strategy[;]
>
> Launching the new safety value now included in our CARES value system and the roll out of the "Sharp! Sharp!" campaign across the Group to reaffirm our commitment to safety[;]
>
> Entrenching visible-felt leadership by executive and senior management at the operations to ensure close out of action plans and high potential hazards that warrant an immediate stop and fix[;]
>
> Establishing an Executive Safety Subcommittee to ensure that our safety strategy is implemented accordingly and that operations are accountable[;]
>
> Setting up a zero harm task team to investigate serious incidents and ensure that recommendations are implemented to prevent recurrence[;]
>
> Reviews of all fatalities by the Office of CEO to ensure close outs are made to prevent recurrence.
>
> **Medium-term plans** to ensure that safety is constantly top of mind include:
>
> Changing the hearts and minds of our employees to be more safety conscious in the workplace and adopt a safety first attitude as a way of life – training is provided to encourage accountability for safety incidents or substandard conditions (including a

10

new slogan: "I am safe! We are safe! Phepha mina! Phepha zonke!"[;]

Restructuring the entire safety department to ensure appropriate allocation of skills[;]

Implementing measures that ensure employees comply with the safety system to reduce non-compliances, substandard conditions and accidents.

**Long-term safety plans** (see 12-point plan below) include:

Aligning systems in the safety department across both divisions to ensure common understanding and a single reporting system that enables the sharing of experiences and knowledge of best practice Documenting the new safety management system to guide management of safety[;]

Securing tripartite commitment from Sibanye, the Mine Health and Safety Council and the DMR in support of a more effective safety management process at all operations.



*Id.* ¶ 50. Safety became a corporate focus. Sibanye changed the acronym it used to represent its core values from C.A.R.E. to C.A.R.E.S., with the "S" standing for safety; began most of its

11

presentations with a discussion of safety; and added sections to its 2016 and 2017 20-Fs entitled "health and safety focus." *Id.* ¶ 51-52.

Plaintiffs allege that Froneman, van Niekerk and Robinson all closely monitored safety, with Froneman personally involved in reviewing incidents and setting safety standards. *Id.* ¶ 46. The principal working offices for Froneman, van Niekerk and Robinson were at the sites of the Driefontein and Kloof mines. *Id.* Robinson received and briefed van Niekerk on Sibanye Daily Safety Reports concerning all South African operations. *Id.* Robinson held, and briefed van Niekerk on, monthly reviews with the responsible Vice Presidents of the mining operations, in which he discussed leading and lagging indicators relating to safe operations and conditions causing high risks of accidents. *Id.* Robinson provided regular reports to van Niekerk on Sibanye's safety, that included detailing safety hazards in Sibanye's mines. *Id.* Van Niekerk reported these hazards to Froneman. *Id.* Froneman also sat on Sibanye's Safety and Health Committee that met quarterly to review fatal accidents, among other safety topics. *Id.*

Plaintiffs allege that Froneman appointed a senior executive in the CEO's office to spearhead safety operations and was personally involved in creating, and reviewing, all incident reports involving fatalities. *Id.* According to Sibanye's 2017

12

20-F, Sibanye held "[f]ormal monthly close-out meetings following a[ny] fatal accident [to] ensure that any resulting revisions to standards and controls, re-engineering and training are rolled out across the organisation." *Id*. Sibanye added that "[a]ll such remedial actions are actively monitored, with all levels being involved, from mine overseer to mine management to executive management." *Id*. Sibanye also noted in its 2017 20-F that "[i]nternal processes are supported by bimonthly meetings at the [Mine Health and Safety Council], with peers in the sector, and the [Department], in line with efforts to secure tripartite commitment to more effective safety management processes across the sector, and to facilitate the sharing of information and lessons learnt." *Id*.

### 3. Allegedly Misleading Statements

Plaintiffs allege that Defendants' statements misleadingly attributed decreases in fatalities in late 2016 and 2017 to the implementation of Sharp!. Plaintiffs further allege that Sharp! did nothing to address the actual causes of Sibanye's poor safety conditions, which directly caused the fatalities. The amended complaint pleads that the true causes of miner fatalities were that: "(a) Sibanye's compensation structure created incentives to flout safety rules; (b) management, following these incentives, instructed miners to work in unsafe conditions and punished those who exercised their

13

rights to leave unsafe workplaces; and (c) management did not address unsafe conditions of which they were made aware. In truth, Sibanye's fatalities were lower in late 2016 and 2017 because of random chance." *See, e.g., id.* ¶ 55.

Plaintiffs allege that Defendants made false statements tying Sharp! to safety improvements through, *inter alia*, CEO public statements on conference calls, earnings calls, SEC filings, investor relations presentations, a Prospectus, and press releases. On February 23, 2017, Froneman reiterated Sibanye's safety commitment through an earnings call and accompanying press release. *Id.* ¶ 56. Froneman opened an earnings call that day by stating:

> [S]afety first, and as you would know, when we presented last time, we said our safety needed a lot of improvement. We've changed structures. We've developed a 12-point strategic plan, and we are starting to see improvements. As you can see, we've seen a 50% improvement in fatality injury frequency rate and a 27% improvement in serious injury frequency rate.

*Id.* Froneman also stated that Sibanye's "renewed focus on safety has delivered noticeable results," a statement repeated in an accompanying slide. *Id.* ¶ 57. Sibanye also issued a press release quoting Froneman as saying that "[t]he new safety structures and interventions announced in August 2016, have thus far been effective, with the Group safety performance much improved in the second half of the year." *Id.* ¶ 58.

14

On March 3, 2017, Sibanye filed an updated investor relations presentation with the SEC regarding its acquisition of Stillwater, and noted that Sibanye's "[s]afety improved after proactive intervention in August 2016." *Id.* ¶ 60. Defendants updated this investor presentation on March 8, 2017, and March 31, 2017, reiterating that "[s]afety improved after proactive intervention in August 2016." *Id.*

On April 7, 2017, Sibanye filed its annual report on Form 20-F with the SEC ("2016 20-F"), with Froneman's sign off. *Id.* ¶ 63. The 2016 20-F stated that:

> Despite a general improvement in the fatality rate prior to 2016, there was a disappointing regression in fatalities during the first six months of 2016 in the Gold Division. In the first half of the year, eight fatalities were recorded, raising serious concerns at executive level [sic]. A series of high-level safety workshops were held and an urgent 12-point safety plan devised. Following its implementation, safety performance improved with four fatalities recorded by the Gold Division in the second half of the year.

*Id.*

On May 18, 2017, Sibanye filed a Prospectus in connection with its acquisition of Stillwater Mining Company that stated that "[s]afety improved after proactive intervention in August 2016." *Id.* ¶ 65.

On August 30, 2017, Defendants filed a press release to announce earnings that stated:

> Safety remains our key priority as a Group

15

> and we will establish best practice based on
> the exemplary safety records of our US PGM
> operations.
>
> Safety indicators for the SA Region for
> the six months ended 30 June 2017 improved
> significantly when compared with the same
> period in 2016, with the Serious Injury
> Frequency Rate improving by 18% to 3.96 per
> million hours and the Lost Day Injury
> Frequency Rate improving by 10 % to 6.46 per
> million hours. These improvements are
> largely on the back of the rigorous
> implementation and monitoring of the 12 point
> [Sharp!] safety improvement plan initiated
> in the second half of 2016.

*Id.* ¶ 67. On a conference call that day, Froneman stated that,

"our safety has improved from last year. You would remember,

last year, we went through a bad first half. We implemented a

12-point strategic plan and our safety results are better." *Id.*

¶ 69.

On October 26, 2017, Defendants filed a press release

to announce third quarter 2017 earnings, that stated:

> Quarter-on-quarter the SA region serious
> injury frequency rate, lost day injury
> frequency rate and total injury frequency
> rate have all improved significantly. We
> believe that our enhanced efforts and our
> safe behaviour focus will assist further
> improvements in the fourth quarter 2017.

*Id.* ¶ 71.

In a press release to discuss earnings issued February

22, 2018, Sibanye stated:

> SAFETY
>
> The benefit of the revised safety strategy
> adopted in the Southern Africa (SA) Region
> in the latter half of 2016 and rolled out

16

> across the operations during 2017, is
> evident in improvements in all the main
> safety indicators across the region for the
> six months ended 31 December 2017.
> * * * * *
>
> The safety improvements continued through
> the year, with the SA gold operations, in
> the December 2017 quarter, recording their
> first fatality free quarter since March
> 2015. The SA PGM operations sadly
> experienced one fatality when Mr. Moagisi
> Selaotswe was struck by a utility vehicle
> despite the proximity detection system that
> was in effect to provide warnings to the
> vehicle operator and pedestrians.

*Id.* ¶ 73.

Finally, on April 2, 2018, Sibanye filed its 2017 20-F, wherein Froneman's CEO Review stated:

> Safety is our principal value and we continue
> to focus significant effort and attention as
> well as resources on ensuring that our
> employees are able to work in a safe and
> conducive environment. Following a
> regression in our safety performance in the
> first half of 2016, we adopted a revised
> safety strategy in the SA region in the
> latter half of 2016 that was rolled out
> across all operations during 2017.
>
> There was a significant improvement in all
> the main safety indicators across the region
> during 2017, with the SA region's serious
> injury frequency rate (SIFR) improving by
> 14% to 3.59 per million hours worked, and
> the lost-time injury frequency rate (LTIFR)
> improving by 13% to 5.76 per million hours.
> Safety improvements continued through the
> year, with the SA gold operations, in the
> December 2017 quarter, recording their first
> fatality free quarter since March 2015.
>
> We have now restored our leading position,
> among both gold and South African PGM peer
> companies, as the benchmark on most safety
> indices in the gold and PGM sectors.

*Id.* ¶ 75.

17

> • A robust safety strategy and policies aligned with our overall strategy are in place
>
> • Ongoing monitoring of compliance with these policies
>
> • Ongoing stringent environmental monitoring and compliance
>
> • Health and safety auditing to ensure compliance

*Id.* ¶ 76. In the 2017 20-F, Defendants also stated that:

> The benefit of the revised safety strategy adopted in the SA region in the latter half of 2016 and rolled out across the operations during 2017, is evident in improvements in all the main safety indicators across the region for the six months ended 31 December 2017. Compared with the same period in 2016, the SA region's serious injury frequency rate (SIFR) improved by 14% to 3.59 per million hours with the lost-time injury frequency rate (LTIFR) improving by 13% to 5.76 per million hours worked.

*Id.* ¶ 77. Sibanye also touted the alleged success of Sharp!:

> Addressing and improving safety is a continuous process. Work begun in 2016 on the Sharp! Sharp! safety campaign to embed a culture of safety within Sibanye-Stillwater continued into 2017, with this campaign now well-entrenched within the SA region, where its roll-out at the gold and PGM operations was completed. While an inordinate amount of time is spent on safety training at our South African operations, improved safety performance benefits Sibanye-Stillwater's overall performance and the achievement of our strategic objectives.

*Id.* ¶ 78.

## 4. The Rustenburg Incident

On March 24, 2018, a winch operator was killed in an

incident at Sibanye's Rustenburg mine ("Rustenburg Incident").
*Id.* ¶ 97. Sibanye employee Johannes Tsholoane Rakoti discovered
the winch operator's body and determined that he died after
being hit by a rock that fell as it was scraped by a mining
scraper. *Id.* ¶ 98. The Department of Mineral Resources ("DMR")
conducted an inquiry and concluded that Sibanye safety managers
had noted the safety hazards that led to the fatality days or
weeks before but failed to address the deficiency or stop
mining. *Id.* ¶ 99. Specifically, on March 14 and March 22, 2018,
two different safety managers notified the day and night shift
bosses that the rigging in the area where the accident occurred
was secured with only one bolt, rather than the three that were
required by the Rustenburg mine's safety standards and
procedures. *Id.* ¶ 99(a). Further, the March 22, 2018 inspection
revealed that the bell wire normally used to signal emergencies
was missing from the accident area. *Id.* ¶ 99(b). Shift managers
were aware of these safety deficiencies, and made note of them
in a safety logbook. *Id.* ¶ 100-01. An *in loco* inspection of the
accident site on the day of the incident confirmed the absence
of those two safety measures. *Id.* ¶ 102. Froneman would have
been aware of this investigation. *Id.* ¶ 103.

### 5. The Driefontein Incident

On May 3, 2018, at approximately 1:17 p.m., an
earthquake at the Driefontein mine measuring 2.5 on the Richter

scale, with an aftershock measuring 2.2, caused a rockfall that trapped 13 workers in its Masakhane shaft's CL40-27 7W Panel (the "7W Panel") area for two days, eventually killing seven workers ("Driefontein Incident" or "accident") and leading to a Department of Mineral Resources investigation ("Driefontein Inquest"). *Id.* ¶¶ 104-5, 117-18. The shaft manager, Mr. Karato Katake, was aware that the shaft's CL40-27 7W Panel area was at high risk of earthquakes, and that it lacked adequate meshing and bolting to catch falling rocks and prevent rock walls from collapsing. *Id.* ¶ 106.

On December 12, 2017, Sibanye's Rock Engineering Department designated the CL40-27 stope in which the 7W Panel is located a "Special Area," at increased risk for rockfalls, because of its proximity to a hazardous rock formation. *Id.* ¶ 109. CL40-27's safety officer, Relton Petro, reported two earthquakes on January 13 and 14, 2018, measuring 1.3 and 1.8 on the Richter scale, respectively, that caused rocks to fall throughout the CL40-27 stope, including on the 7W Panel. *Id.* ¶ 111.

Sibanye's seismic warning system monitored short-term seismic risk in the Masakhane shaft by separating the shaft into 30 locations and rating each on a 10-point scale. *Id.* ¶ 112. A rating of 6 or higher requires withdrawing employees and conducting a risk assessment. *Id.* A rating of 8 to 10 is

20

considered a "HIGH short-term seismic hazard rating." *Id.* In the weeks leading up to the May 3, 2018 Driefontein Incident, the CL40-27 stope was one of at least five locations that was rated 6 or higher; on April 3, it was 1 of 3; on April 4, it was 1 of 3; and on April 5, it was 1 of 3. On these days, the CL40-27 stope's risk warnings were: 6 on March 13, 8 on April 3, 8 on April 4, and 7 on April 5, 2018. *Id.* ¶ 113. Its rating on April 26 was an 8, and on April 28, the stope was rated 6. *Id.*

On May 2 or 3, there had been 12 separate seismic events at the Masakhane shaft, *see* Warnot Decl., Def. Ex. 15 at 651 (Masakhane Seismic Rating May 3, 2018 to April 24, 2018), with another location recording 22 seismic events. *Id.* ¶ 116. On May 2, the day before the accident, the instruments recorded a risk rating of 2 at the Masakhane shaft. *Id.* ¶ 91. On the morning of May 3, the day of the accident, the risk rating of the CL40-27 stope, which includes the 7W Panel, was recorded at 2. Warnot Decl., Def. Ex. 15 at 651 (Masakhane Seismic Rating May 3, 2018 to April 24, 2018)(as of 4:15 a.m. on May 3, before the Accident, there was a rating of 2); Def. Ex. 16 ¶ 5.6 (Statement by Pinkie Clova Ndaba)("The area where the accident occurred was classified as a 2 rating (Green: Low Short Term Seismic Hazard Rating) applicable to the shift, at the time of the accident."). On May 3, Sibanye recorded a risk warning of 6 at the CL40-27 stope in the Masakhane shaft, Am. Compl. ¶ 116,

21

as of 7:45 p.m., at least 6 hours after the Driefontein
Accident. Warnot Decl., Def. Ex. 15 at 652 (Masakhane Seismic
Rating May 3, 2018 to April 24, 2018); *see* Am. Compl. ¶¶ 117-18
(Driefontein Accident occurred at 1:17 p.m.).

On May 3 at 12:23 P.M., Mr. Katake and others on the
surface felt an earthquake measuring 2.5 on the Richter scale,
with the seismic monitoring system showing that the earthquake
occurred in the Masakhane shaft. *Id*. ¶ 117. Mr. Katake
instructed miners in locations immediately adjacent to the
earthquake to evacuate. *Id.* At 1:17 p.m., approximately 54
minutes later, Mr. Katake and others felt an aftershock
measuring 2.2 on the Richter scale in the Masakhane shaft, near
the CL40-27 stope, approximately 2.5 kilometers from the
original earthquake. *Id*. ¶ 118. The complaint is unclear as to
whether Plaintiffs allege that the initial earthquake or the
aftershock caused rocks to fall in the Masakhane shaft. *Id*.
Nonetheless, the subsequent rock fall trapped 13 miners, fatally
injuring seven, in the 7W Panel. *Id*. ¶¶ 7, 104; Warnot Decl.,
Def. Ex. 5 at 78 (Sibanye-Stillwater Form 20-F 2018).

### a.   The Risks at the Masakhane Shaft

The Masakhane shaft fell behind production early in
2018. *Id*. ¶ 119. The gap continued through May 2018, including
the section of the Masakhane shaft that included the 7W Panel,
which had planned to mine 12,584 tons of ore but only achieved

11,075 tons. *Id.* To address the production shortfall, Plaintiffs allege that Mr. Katake operated the shaft even when Sibanye's own safety procedures prohibited mining. *Id.* ¶ 120. Senior shaft management held monthly meetings to address safety issues where Mr. Katake, listed as "Team Captain," was marked absent for every meeting in the five months leading up to the May 2018 Driefontein Incident. *Id.* ¶ 122. The meetings addressed, among other issues, new safety developments and worksites that had fallen below 92% compliance with safety procedures, also known as "red" sites. *Id.* ¶¶ 119, 123. Minutes of the March 13, 2018 meeting to plan the Masakhane shaft's April 2018 operations include, in a section titled "General," that "[a]ll 17 working places are red [i.e., dangerous]. Disciplinary action must be taken against the offenders. All red working places must be stopped and fixed." *Id.* ¶ 124. Minutes of the April 11, 2018 meeting to plan the shaft's May 2018 operations reiterate that "[a]ll red working places must be stopped and fixed." *Id.* ¶ 126.

For the 7W Panel specifically, successive safety compliance reports on February 21, March 13, and April 30, 2018 rated the panel's compliance at 78%, 76%, and 80%, respectively. *Id.* ¶ 128. Contrary to the guidance for "red working places" generally, for the 7W Panel at the CL40-27 stope, the April 11, 2018 planning meeting minutes state that working places with a

23

compliance "less tha[n] 80%" must be stopped and fixed, not 92%.[2]
Warnot Decl., Def. Ex. 17 at 532 (Planning Minutes: May 2018 to
Nov. 2018).

For months before the May 3, 2018 Driefontein
Incident, Sibanye safety officers documented that the 7W Panel
lacked basic safety precautions designed to prevent or catch
rocks from falling, while noting that the rock around the 7W
Panel was fractured and at risk of collapse. *Id.* ¶ 131. Sibanye
safety officers produced reports noting that the hanging wall at
the 7W Panel was fractured on January 15 and March 31, 2018. *Id*.
¶ 132. Another safety report noted that Sibanye had not properly
supported a hanging wall in the 7W Panel on January 10 and
February 21, with a further report that the CL40-27 stope was
inadequately supported as of April 30, 2018. *Id*. ¶ 133. Reports
dated January 15, February 15, March 7, March 13, March 31, and
April 30, 2018, all noted high risks that required immediate
repair, including missing mesh to catch falling rocks and
prop/bolts to hold the hanging wall. *Id*. ¶ 134. Sibanye's
internal investigation after the Driefontein Incident, published

---

[2]     Generally, worksites in the Masakhane shaft that had fallen below 92%
compliance with safety procedures were known as "red" sites, requiring
workers to "stop and fix" the sites to bring them back into compliance. Am.
Compl. ¶¶ 119, 123. However, as discussed in more depth *infra,* for the 7W
Panel at the CL40-27 stope, the April 11, 2018 planning meeting minutes state
that working places with a compliance "less tha[n] 80%" must be stopped and
fixed, not 92%. Warnot Decl., Def. Ex. 17 at 532 (Planning Minutes: May 2018
to Nov. 2018).

May 10, 2018, found that Sibanye violated three procedures which led to the incident, including improper bolting and meshing, further confirmed by photographs taken in a May 16, 2018 investigation. *Id.* ¶ 135-36.

Defendant Froneman participated in the subsequent investigation of the Driefontein mine, remaining in constant contact with relevant mine personnel and personally spending 10.5 hours at the mine. *Id.* ¶ 137. Froneman and the CEO's office were likely to be involved in a May 9, 2018 production request by the Department of Mineral Resources relating to the incident. *Id.* ¶ 138. Sibanye closed the Masakhane shaft after the incident, reopening the Eastern shaft in June 2018, and the Western shaft in October 2018, after substantial safety upgrades. *Id.* ¶ 141.

### 6. The Kloof Incident

On June 11, 2018, Mr. Linganani Innocent Mngadi, a shift boss with 14 years of mining experience, ordered five experienced crew members, one with 16 years of experience and two others with 7 years' experience each, to accompany him into an unsafe shaft in the Kloof Mine. *Id.* ¶ 143, 146. The shaft had been closed by order of the Department of Mineral Resources. *Id.* It was marked off with a self-sealing ventilation door and secured with chains. *Id.*

According to an inspection report prepared by Sibanye

25

after the accident, *see* Warnot Decl., Def. Ex. 9 (May 2018
Injury Investigation Report In Terms of Section 11.5—MHSA), the
shaft was exceptionally hot. *Id*. ¶ 144. Plaintiffs allege that
temperatures at the shaft entrance, assumedly on the day of the
accident, exceeded 37 degrees Celsius (99 degrees Fahrenheit),
far above the limit of 31 degrees Celsius (88 degrees
Fahrenheit). *Id*.; Warnot Decl., Def. Ex. 9 at 14 (May 2018
Injury Investigation Report In Terms of Section 11.5—MHSA). The
Mngadi crew members who entered the shaft expressed alarm and
requested a safety representative. *Id*. ¶ 145. The safety
representative turned back after proceeding five meters into the
shaft, citing safety concerns. *Id*.; Warnot Decl., Def. Ex. 9 at
12 (May 2018 Injury Investigation Report In Terms of Section
11.5—MHSA). Plaintiffs allege that the Mngadi crew members were
pressured by mine management into not exercising their Employee
Section 23 Rights, while the safety representative was allegedly
also pressured into not exercising his Safety Representative
Section 23 Rights. *Id*. ¶¶ 147, 149. The shift boss, Mr. Mngadi,
and four crew died, with the last Mngadi crew member suffering
serious injuries. *Id*. ¶ 148. Three members of the rescue team
sent to rescue Mr. Mngadi's crew also suffered injuries due to
the heat, leading one rescue team member to require
hospitalization. Am. Compl. ¶ 144.

     Plaintiffs base their allegations on an investigatory

report published by a South African newspaper, the *Sowetan*, on June 14, 2018, quoting an anonymous mine worker responding to the question of why the miners hadn't exercised their Section 23 Rights who stated that "it was not [the shift boss's] decision to make, it came from the mine...[i]f you are told to do something and you refused you are threatened. Those guys had no choice, even their shift boss." *Id*. ¶ 149.

On a July 2, 2018 safety call, Mr. Froneman stated that "there are clearly constraints in the safety system and perhaps even intimidation when individuals want to withdraw." *Id*. ¶ 150. On an August 23, 2018 earnings call, Froneman confirmed that shift bosses are management-level employees. *Id*. ¶ 151. Plaintiffs allege that "[t]he only reason" a shift boss would prioritize mining over safety and put themselves and other workers at risk is "in response to senior management pressure and financial incentivization." *Id*. ¶ 151.

### 7. Sibanye's Compensation Structure

Sibanye's 2018 annual report disclosed that between 28% and 38% of the compensation of Sibanye's junior- and mid-level managers came from cash bonuses. *Id*. ¶ 152. Mr. van Niekerk admitted on an investor call, *see* Def. Mem. 17 *and* Warnot Decl., Def. Ex. 10 at 17 (Transcript of S1 2018 Earnings Call), that Sibanye's compensation structure incentivizes safety over production:

> Safety does feature in our production centers, and it features quite significantly. Having said that, it's not the line actually. Our bonus does, at the lowest level in the organization, does reward call it output more than what it does safety. We are in the process of reviewing that to put a lot more emphasis on safe production. I can't correct all the numbers because it varies by level. And our underground worker is different to a miner, is different to shift supervisor who is different to a miner, yes.
>
> What I can tell you though is we have already reviewed that all the shift supervisor to place the emphasis on safe production in accordance with the law. We've actually revisited the percentage on middle management and as well as the safety people in our organization going forward is rewarded totally on safe production and there is no production even with the scheme.

Am. Compl. ¶ 153. Defendants add necessary context that, immediately following this statement in the transcript of the S1 2018 Earnings Call that Defendants provided to the court, Mr. Froneman clarified: "Yes, so we generally reward for safe[ty], cost, volume and grade. So when Rob[ert van Niekerk] says safety is not the biggest portion, generally will equal, we generally see those as equal incentives. So, cost is – cost reduction are rated the same as the safety incentive as is the quality of mining in terms of grade as is volume. At senior levels it's actually exactly the same." Warnot Decl., Def. Ex. 10 at 17 (Transcript of S1 2018 Earnings Call).

### 8. Allegations Regarding Economic Loss

Plaintiffs allege that Sibanye's materially false and misleading statements and omissions regarding safety artificially inflated the price of its securities during the

Class Period. *See* Am. Compl. ¶¶ 153–174. Plaintiffs point to a series of partial disclosures by Defendants that allegedly revealed the truth to the market and resulted in a precipitous decline in the price of Sibanye's securities. *Id.*

On May 3, 2018, Sibanye disclosed that 13 miners were trapped in its Driefontein mine. *Id.* ¶ 155. The price of its ADRs fell from $3.65 to close at $3.53 (3.3%). *Id.* On Saturday, May 5, 2018, *Reuters* reported that seven miners died in the same Driefontein Incident. *Id.* ¶ 156. That same day, multiple stakeholders issued statements expressing concern over mine conditions. *Id.* The president of the union representing half of Sibanye's workforce, the Association of Mineworkers and Construction Union ("AMCU") stated that "[t]he [AMCU] undertakes to heighten its campaign in ensuring that the Ministry of Mineral Resources up its game in regulating mining in South Africa." *Id.* The union representing a third of Sibanye's workers, the National Union of Mineworkers ("NUM"), the President of South Africa, Cyril Ramaphosa, the Chair of South Africa's Portfolio Committee on Mineral Resources, and a spokesman for the ruling African National Congress party, all expressed concern over mine safety conditions. *Id.* By Monday, May 7, 2018, Sibanye's ADRs fell from $3.45 to close at $3.12 (9.6%). *Id.* ¶ 157.

On May 23, 2018, the AMCU reported that two previously

unreported earthquakes, one on May 21 and another on May 22, 2018, occurred at the Kloof mine. *Id*. ¶ 158. Five employees were injured. *Id*. On May 23, 2018, Sibanye's ADRs fell from $2.85 to $2.70 (5.3%). *Id*. ¶ 159. On May 24, 2018, Sibanye published a press release criticizing AMCU's suggestion that Sibanye would send workers into unsafe mines. *Id*. ¶ 160. On May 25, 2018, Sibanye's ADRs fell from $2.62 to $2.46 (6.1%). *Id*. ¶ 161. On June 11, 2018, Sibanye reported that three employees died in the Kloof mine, and its ADRs fell from $2.91 to $2.76 (5.2%). *Id*. ¶ 162. On June 12, 2018, Sibanye, facing criticism from its unions, reported that another miner died in the Kloof Incident, and its ADRs fell further to $2.63 (down 4.7%). *Id*. ¶ 163-4. On June 26, 2018, Sibanye reported that a mine worker had died at the Driefontein mine. *Id*. ¶ 165. That day, amid a call by the chair of South Africa's Portfolio Committee on Mineral Resources for Sibanye to be placed into receivership, the price of its ADRs fell from $2.82 to $2.51 (over 11%). *Id*. ¶ 165-66.

On June 27, 2018, a Citi analyst downgraded Sibanye because of its safety record. *Id*. ¶ 167. The analyst observed that Sibanye "ha[s] embarked on unsustainable short-term measures to increase profits from its [South Africa] gold business." *Id*. The analyst cited as examples "high-grading by mining the limited high-grade pillars [that] were left behind by [Sibanye's predecessor] since they were too dangerous to mine"

30

and "cutting capital [thereby] compromising the longer term integrity of the mines." *Id*. The Citi analyst stated that investors should be concerned not only with Sibanye's future financial performance but with its morality. *Id*. The unions also leveled public criticism at Sibanye's miner safety efforts. *Id*. On June 27, 2018, the price of Sibanye's ADRs fell to $2.25 (10.4%).

Sibanye released its third quarter results for 2018 on November 1, 2018, noting that safety incidents "continued to affect productivity across the gold operations in Q3 2018, with Driefontein in particular, delivering at substantially reduced production rates." *Id*. ¶ 169. On an earnings call that day, Froneman explained poor results as follows:

> We've been ultrasensitive towards our employees and we have not pushed production. We have focused on getting safety foremost in everybody's minds. We're being sensitive to the trauma, and they are actually only moving out of that phase now.

*Id*. Froneman noted that the Sibanye workforce was "traumatized" from the safety incidents, leading to decreased gold mine production, and acknowledged that safety concerns may cause Sibanye to reconsider operating the mines, noting that "[w]e've had a long hard look at the safety issues and whether they are solvable, because if they're not solvable, then we shouldn't be operating," and adding that "[w]e believe they are." *Id*. ¶ 170. On November 1, 2018, the price of Sibanye's ADRs fell from $2.82

to $2.56 (9.2%). *Id*. ¶ 172.

### 9. Additional Allegations Regarding Scienter

In 2016 and 2017, Sibanye was in negotiations to acquire American PGM miner Stillwater and South African based Lonmin. *Id*. ¶¶ 175-80. Both required multiple stakeholder approvals, including government entities such as the South African Reserve Bank. *Id*. Both PGM miners Stillwater and Lonmin had unique sensitivities: the PGM Stillwater acquisition required a loan of $2.65 billion, and the Lonmin acquisition would subject 60,000 additional workers, and their representative unions, to Sibanye's safety regime. *Id*. Plaintiffs allege that these concerns offered further reasons for Sibanye to conceal its safety practices. *Id*. ¶ 181.

### B.        Substantive Claims

Plaintiffs' amended complaint contains the following two claims:

**Claim I**: Defendants allegedly violated Section 10(b) of the Exchange Act and Rule 10b-5 because they "disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"

32

in connection with Defendants' sale of Sibanye securities to Plaintiffs during the class period. *Id.* ¶¶ 191-93.

Plaintiffs specifically allege that three categories of statements misled investors: first, statements made in 2017 and early 2018 related to the Sharp! safety program (*Id.* ¶¶ 56-58, 60, 63, 65, 67, 69, 71, 73, 75-78); second, statements made in 2018 related to miner fatalities during the class period (*Id.* ¶¶ 81, 83, 85); and third, statements concerning Sibanye's knowledge of seismic activity at the Driefontein mine that resulted in miner fatalities on May 3, 2018. *Id.* ¶¶ 88, 90, 92, 94. Plaintiffs allege that Defendants' conduct caused the price of Sibanye's ADRs to be falsely inflated. *Id.* ¶ 197-98.

**Claim II:** Defendant Froneman allegedly violated Section 20(a) of the Exchange Act based on control person liability for public statements made about Sibanye during the class period. *Id.* ¶¶ 201-05.

<u>**LEGAL STANDARD**</u>

## I.   Rule 12(b)(6) Standard

Rule 12(b)(6) provides for the dismissal of a cause of action if a plaintiff's complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To determine whether a complaint states a plausible claim for relief, the Supreme Court has suggested a "'two-pronged approach.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, a court should begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plausibility standard, however, does not require a showing of a "probability" of misconduct, but it does demand more than a "sheer possibility that a defendant has acted unlawfully." *Id.*

A well-pleaded complaint may survive a motion to dismiss even where "it strikes a savvy judge that actual proof

34

of those facts is improbable, and that a recovery is very remote
and unlikely." *Twombly*, 550 U.S. at 556 (citation and internal
quotation marks omitted). This is because the court's function
is "not to weigh the evidence that might be presented at trial
but merely to determine whether the complaint itself is legally
sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.
1985).

In conducting such an assessment on a Rule 12(b)(6)
motion to dismiss, courts must "'accept as true all allegations
in the complaint and draw all reasonable inferences in favor of
the non-moving party.'" *Vietnam Ass'n for Victims of Agent
Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008)
(citation omitted); *see also Starr v. Sony BMG Music Entm't*, 592
F.3d 314, 321 (2d Cir. 2010). Further, courts may consider "the
full text of documents that are quoted in the complaint or
documents that the plaintiff either possessed or knew about and
relied upon in bringing the suit." *Holmes v. Air Line Pilots
Ass'n*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (internal
quotation marks omitted).

## II. Section 10(b) Claim

To state a claim for securities fraud under Section
10(b) of the Exchange Act, Plaintiffs must allege "(1) a
material misrepresentation (or omission); (2) scienter, i.e., a
wrongful state of mind; (3) a connection with the purchase or

35

sale of a security; (4) reliance ...; (5) economic loss; and (6) loss causation." *In re Liberty Tax, Inc. Sec. Litig.,* No. 20-652, 2020 WL 5807566, at *1 (2d Cir. Sept. 30, 2020)(quoting *Singh v. Cigna Corp.,* 918 F.3d 57, 62 (2d Cir. 2019). "Securities fraud complaints are also subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Together, they require a complaint to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, ... (4) explain why the statements were fraudulent, and (5) state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud." *In re Liberty Tax, Inc. Sec. Litig.,* No. 20-652, 2020 WL 5807566, at *2 (2d Cir. Sept. 30, 2020)(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

## DISCUSSION

### I.   Material Misrepresentations or Omissions

#### A. 10(b) Legal Standard

"To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an

investor to reasonably rely on that statement as a guarantee of
some concrete fact or outcome which, when it proves false or
does not occur, forms the basis for a § 10(b) fraud claim." *City
of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d
173, 185 (2d Cir. 2014). "Materiality is a mixed question of law
and fact, and [a] fraud claim may not properly be dismissed
summarily on the ground that the alleged misstatements were not
material unless they would have been so obviously unimportant to
a reasonable investor that reasonable minds could not differ on
the question of their importance." *Gross v. GFI Grp., Inc.,* 784
F. App'x 27, 29-30 (2d Cir. 2019) (quotations omitted). A
complaint must also satisfy the PSLRA's particularity
requirement to sustain a Rule 10b-5 claim, including identifying
the false statement, "demonstrat[ing] with specificity why and
how each statement is materially false or misleading," *Boca
Raton Firefighters & Police Pension Fund v. Bahash,* 506 F. App'x
32, 38 (2d Cir. 2012) (quotations omitted), and "stat[ing] with
particularity both the facts constituting the alleged violation,
and the facts evidencing scienter." 2020 WL 5807566, at *2
(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.
308 (2007). A complaint "marked by lengthy block quotes followed
by pro forma reasons why the statements quoted are allegedly
false[ ] fails to state a claim.... [Plaintiff must] identif[y]
statements and omissions, describe[ ] relevant predicate events,

and allege[ ] how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.,* 2020 WL 248729, at *530 (S.D.N.Y. Jan. 15, 2020) (quotations and citations omitted).

### B. Application

Plaintiffs allege that Defendants made three categories of allegedly false and misleading statements or omissions. The first category are Sibanye's statements in 2017 and early 2018 that they were "starting to see improvements" regarding miner safety following the late 2016 launch of Sharp! (the "Sharp! Statements"), a miner safety program. *See* Am. Compl. ¶¶ 56-58, 60, 63, 65, 67, 69, 71, 73, 75-78. The second category of allegedly false and misleading statements concerns the causes of certain fatalities at Sibanye (the "Causes of Fatalities Statements"). *See* Am. Compl. ¶¶ 81, 83, 85. The third category of statements that Plaintiffs allege are materially false or misleading concern seismicity at Driefontein on May 3, 2018. *See* Am. Compl. ¶¶ 87, 89, 91, 93. The court evaluates each in turn.

### 1.    The Sharp! Statements

Plaintiffs claim that Defendants misled investors by alleging that Sharp!, a safety program implemented in late 2016 in the wake of an increase in fatalities among Sibanye's mines in 2016, did not address the true cause of safety failures that

38

led to miner fatalities. *See* Am. Compl. ¶¶ 54-94. Plaintiffs allege that the true cause for fatalities was non-executive employee compensation, and any improvement Defendants saw in miner fatalities after Sharp! was implemented was due solely to "random chance." *Id.* Plaintiffs argue that Defendants made misleading statements to investors while knowing that the drop in fatalities that Defendants saw after implementing Sharp! was a result of "random chance." Pl. Opp. 16. In support of their allegations, Plaintiffs offer the 2018 accidents in the Rustenburg, Driefontein, and Kloof mines. Am. Compl. ¶¶ 54-94.

For the reasons below, Plaintiffs' allegations predicated on the Sharp! program cannot survive Defendants' motion to dismiss because they: (1) fail to plead with particularity why Defendants' statements were misleading as required by the PSLRA; and (2) concede that Sibanye's statements regarding the reduction in fatalities were actually true.

First, the amended complaint fails to meet the PSLRA's particularity requirement as it does not allege with specificity a particular false or misleading statement, and does not allege facts explaining how and why a particular statement regarding Defendants' implementation of Sharp! is misleading. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The amended complaint proffers block quotes with "vague

39

allegations purporting to explain how and why the bolded and italicized portions are misleading. However, Plaintiffs['] bolding and italicizing does little to satisfy the [PSLRA's] specificity requirement." *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.,* 859 F. Supp. 2d 572, 577–78 (S.D.N.Y. 2012). *See also In re Alcatel Sec. Litig.,* 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs neglect to make it clear...which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts"); *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.,* 10-cv-864 (SLT)(RER), 2013 WL 1345086, at *5 (E.D.N.Y. Mar. 29, 2013) (same).

Multiple paragraphs in the amended complaint repeat and reallege generally that Defendants made "false and misleading" statements, without providing specific facts as to which, how and why statements about Sharp! or management compensation were false or misleading.

The amended complaint fails to provide plausible facts supporting Plaintiffs' conclusory allegation that Sibanye's statements in 2017 through early 2018 that, after Sibanye's safety program "Sharp!" was implemented, miner fatalities declined in late 2016-2017. Though Plaintiffs concede that miner safety improved after Sharp!, *see* Am. Compl. ¶¶ 3-4, 49, 54-55,

40

they allege that the improvement was due to "random chance," and
not to Sharp!, Sibanye's safety program. Am. Compl. ¶¶ 3, 4, 49,
54, 55, 59, 61, 64, 66, 68, 70, 72, 74, 79, 82, 84, 86, 88, 90,
92, 94, 154. The complaint does not identify statements by
Sibanye that were false when they were made, or statements that
omitted information that Sibanye had a duty to disclose but
failed to provide that would have made the statement not
misleading. *See In re Liberty Tax, Inc. Sec. Litig.,* No. 20-652,
2020 WL 5807566, at *4 (2d Cir. Sept. 30, 2020) (Finding no duty
to disclose where the true reason for a corporate officer's
termination was kept from investors); s*ee also In re Time Warner
Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is
not required to disclose a fact merely because a reasonable investor
would very much like to know that fact. Rather, an omission is
actionable under the securities laws only when the corporation is
subject to a duty to disclose the omitted facts."). Plaintiffs argue
that the court should draw the "reasonable inference" that
improvements in miner safety due to Sharp! were "illusory,"
despite admitting in the same sentence that fatalities occurred
"at a lower rate" in "late 2016 and 2017." Am. Compl. ¶ 55; Pl.
Opp. 19.

The disclosure of accurate historical data by Sibanye
regarding the improvement in miner safety after Sharp! was
adopted cannot sustain a claim for violation of federal

securities law. "[A] violation of federal securities law cannot
be premised upon a company's disclosure of accurate historical
data." *Bahash*, 506 F. App'x at 38–39 (internal citation
omitted). As courts in the Second Circuit have stated, the
"disclosure of accurate historical data does not become
misleading even if less favorable results might be predictable
by the company in the future." *In re Duane Reade Inc. Sec.
Litig.*, No. 02-cv-6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y.
Nov. 25, 2003) (internal quotation marks omitted), *aff'd sub
nom.*, *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir.
2004); *see In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F.
Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held
liable under the securities laws for accurate reports of past
successes, even if present circumstances are less rosy.")
(internal quotation marks omitted); *see also In re Bayer AG Sec.
Litig.,* No. 03-cv-1546 (WHP), 2004 WL 2190357, at *11 (S.D.N.Y.
Sept. 30, 2004) (finding that accurate statements of "strong
sales" records are not actionable "since they are merely
recitations of historical fact and are not alleged to be
inaccurate"). Without pleading plausible facts, Plaintiffs cannot
attribute Sibanye's safety improvements in late 2016 and 2017 to
"random chance."

The most logical inference to draw is that Sharp!
worked as intended and brought about a temporary decrease in

miner fatalities. The parties agree that Sibanye's statements about Sharp! and the decline in fatality rates in late 2016 and 2017 were actually true. Pl. Opp. 14–15; *see* Am. Compl. ¶¶ 56– 78. The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 92 (2d Cir. 2010).

Plaintiffs argue that Defendants' Sharp! Statements were "materially deceiving," Pl. Opp. 13, and rely primarily on two cases, both of which are distinguishable. *See* Pl. Opp. 15– 16. In *Levin v. Resource Capital Corp.,* 15-cv-7081 (LLS), 2016 WL 5867451, at *1 (S.D.N.Y. Oct. 5, 2016), the court found that the description of a loan portfolio as "performing" misled investors because the loans were only "performing" subject to a troubled debt, and that failing to disclose information about the state of the debt was false and misleading. *Levin*, 2016 WL 5867451, at *1. Here, Plaintiffs do not identify information about miner safety or compensation that Defendants failed to disclose. In *Turocy v. El Pollo Loco Holdings, Inc.,* No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *8–*10 (C.D. Cal. Aug. 4, 2017), a district court decision outside of the Second Circuit, defendants made statements on an investor call that affirmatively created the impression that consumer confusion,

the New Year's Eve holiday and changes to the menu were the reasons for the decline in customer traffic and sales, while knowing that pricing was a direct cause of the decline in traffic and sales. *Id.* at *10. Plaintiffs in *Turocy* proffered a specific slide from a board presentation that directly stated that pricing was a cause of lower growth. *Id.* The court thus denied a motion to dismiss, finding that the defendants' statements on an investor call created a material misimpression because the company "knew that the pricing was a direct cause [of lower growth], including the removal of the value-priced menu." *Id.* Defendants in *Turocy* minimized and omitted the known causes of the sales decline through statements that were held to be material, as they were relied upon by reasonable shareholders when making investment decisions. *Id.* Unlike in *Levin* or *Turocy*, Plaintiffs here offer no specific facts to support their allegations that Defendants were aware that "random chance," rather than Sharp!, was actually responsible for a reduction in miner fatalities, and that Defendants allegedly hid the "random chance" explanation from investors by creating Sharp!, all in an effort to increase share price.

Here, Defendants disclosed miner accident and fatality information, the inherent risks of deep mining, and executive compensation in SEC filings and investor calls, and participated in regulatory inquiries. *See, e.g.,* Am. Compl. ¶ 105. Sibanye

44

disclosed the inherent risks of mining gold deposits located deep underground in areas of seismic activity in its South African mines. Warnot Decl., Def. Ex. 2 (20-F Forms for 2016 and 2017) (listing safety as a significant material risk). The lack of plausible and specific facts demonstrating otherwise compels the court to find that the amended complaint fails to state a claim that Defendants misled investors when issuing the Sharp! Statements and disclosures to their investors.

### 2. The Causes of Fatalities Statements

In addition to alleging that "random chance," and not Sharp!, was the true reason for a reduction in miner fatalities in late 2016-2017, Plaintiffs further allege that the true cause of miner fatalities was productivity incentive payments that accounted for 28% to 38% of total non-executive compensation. *Id.* ¶ 152; Pl. Opp. 5. Plaintiffs assert Sibanye's compensation structure was hidden from investors. Am. Compl. ¶¶ 2, 59, 82, 94; Pl. Opp. 16. Plaintiffs, however, fail to allege a plausible link between Sibanye's statements regarding its safety record and any alleged omission of non-executive employee compensation information. Moreover, Plaintiffs' complaint fails to identify which particular "management" employees had compensation structures that incentivized them to disregard Sibanye's safety requirements.

45

Plaintiffs rely on an anonymously sourced newspaper article for their contention that unidentified management (who may or may not have received incentives) "pressured" employees to work in dangerous conditions, and cite the tragic accidents in the Rustenburg, Driefontein, and Kloof mines. Pl. Opp. 19-20; Def. Mem. 18-20; *see* Am. Compl. ¶¶ 149, 163, 167. "A complaint's reliance on newspaper articles may also be problematic. Newspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.,* 19-cv-10067 (PAE), 2020 WL 4734989, at *12 (S.D.N.Y. Aug. 14, 2020) (quoting *In re Optionable Sec. Litig.,* 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008)). "A plaintiff is permitted to rely on newspaper articles in pleading a securities fraud claim, provided that the reports themselves indicate particularized facts in order to support plaintiffs' claims." *Lopez v. Ctpartners Exec. Search Inc.,* 173 F. Supp.3d 12, 31 (S.D.N.Y. 2016) (citations omitted). Plaintiffs may also rely on confidential sources, *i.e.*, persons identified other than by name. *See Blanford,* 794 F.3d at 305 ("[T]he PSLRA does not require confidential sources to be named in the complaint. A complaint may rely on information from

46

confidential witnesses if 'they are described in the complaint
with sufficient particularity to support the probability that a
person in the position occupied by the source would possess the
information alleged.'") (quoting *Novak v. Kasaks,* 216 F.3d 300,
314 (2d Cir. 2000)). Plaintiffs here rely on a source described
as a "miner" in the newspaper report to allege that performance
incentives were the true cause of miner fatalities, without
proffering more about the underlying sources. Defendants argue
that Plaintiffs cannot plead fraud through "completely
unattributed statements, even when the plaintiff alleges on
information and belief that the unattributed statement was made
by an agent of the defendant." Def. Reply 7 (quoting *In re Time
Warner Inc. Sec. Litig.*, 9 F.3d at 265–66.).

        First, Plaintiffs do not indicate that they have
conducted their own investigation nor otherwise provided the
court with sufficient information about the confidential source
allegedly relied upon by the newspaper article. As a result, the
court cannot find that the newspaper article provides
particularized facts that support Plaintiff's claim. The amended
complaint's representation that the newspaper report relied on
anonymous sources with actual knowledge may well be correct.
However, without Plaintiffs' counsel's independent investigation
attempting to confirm the sources' statements or the newspaper
report otherwise meeting Rule 9(b)'s particularity requirement,

*see, e.g., Ctpartners Exec. Search Inc.,* 173 F. Supp. 3d 31, n. 7; *see also In re Millennial Media, Inc. Sec. Litig.,* 14-cv-7923 (PAE), 2015 WL 3443918, at *11, *14 (S.D.N.Y. May 29, 2015), or a review of the source, the facts as alleged in the amended complaint are too sparse to raise an inference that Sharp! was an effort to conceal that Defendant's shift bosses allegedly pressured miners to work in conditions that Defendants knew were unsafe, even were the court to draw an inference, *arguendo*, that the miner sources would be in a position to know. *See, e.g., Ctpartners Exec. Search Inc.,* 173 F. Supp. 3d 31.

Second, Plaintiffs fail to establish a link between Sibanye's safety record and any alleged omission of non-executive employee compensation information. Though Defendants contend that "Sibanye in fact disclosed its executive-level compensation structure in its 2017 20-F, [at] [Def.] Ex. 2 at 109-22," Def. Reply 17, the amended complaint alleges Sibanye's lack of disclosure, before the accidents in 2018, of *non-executive, junior and mid-level* employee compensation. Am. Compl. ¶ 152. Without alleging more specific facts establishing a relationship between the 28% to 38% incentive portion of total compensation and non-executive productivity,[3] Plaintiffs cannot

---

[3]   Mr. van Niekerk's selectively quoted August 23, 2018 statement, Am. Compl. ¶ 153, does not suffice to establish a link between non-executive bonuses and a lack of adherence to safety. Defendants point to Mr. Froneman's clarifying remarks immediately after the van Niekerk statement, that "we generally reward for safe[ty], cost, volume, and grade...we generally see

establish that Defendants had a duty to disclose non-executive compensation. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), and merely speaking about one topic does not give rise to a duty to disclose all facts related to that topic. *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).

Finally, Plaintiffs rely on *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 301 (2d Cir. 2015), for the proposition that the 2018 accidents in the Rustenburg, Driefontein, and Kloof mines establish that mineworker fatalities "at all times, not just in 2018" resulted from Sibanye's allegedly hidden compensation system and performance culture. *Id.*

*Blanford* is inapposite for the following reasons. In *Blanford,* shareholder plaintiffs alleged that defendants, executives at Green Mountain, made fraudulent misrepresentations about inventory, business performance, and growth prospects in a

---

those as equal incentives." Def. Mem. 17; Warnot Decl., Def. Ex. 10 (Transcript of S1 2018 Earnings Call). Further, Plaintiffs' interpretation of van Niekerk's statement that "Sibanye rewarded production but not safety, giving management incentives to sacrifice the latter for the former," *Id.* ¶ 154, is not borne out by a plain reading of van Niekerk's statement, where he states that "Our bonus does, at the lowest level in the organization, does reward call it output more than what it does safety." *Id.* ¶ 153. Even read alone, without van Niekerk's statement and Mr. Froneman's clarification, the statement cannot be read as saying that Sibanye rewards production only, and not safety, as Plaintiffs allege.

manner designed to mislead investors about the strength of Green Mountain's business. *Blanford*, 794 F.3d 301. The *Blanford* defendants fraudulently represented that demand for their Keurig "K-Cups" far exceeded sefendants' supply of inventory. While hiding excess inventory from the public and discarding it without selling the inventory, the *Blanford* defendants created a false growth narrative and relied upon the narrative to sell their individual stock holdings at a profit. The *Blanford* plaintiffs' claims survived a motion to dismiss on the strength of several confidential witnesses who confirmed the stockpiling and dumping of inventory, on the basis of which the court could infer the *Blanford* defendants' scienter. *Id.* at 302. Here, however, Plaintiffs have not alleged plausible facts that Defendants' statements regarding the decline in serious injuries and fatalities following Sharp! were false or that Defendants hid data regarding the true rates of injury and death in their mines. Moreover, Plaintiffs fail to plead any facts that establish a plausible connection between Defendants' failure to disclose unidentified performance incentives to unidentified "management" and the flouting of safety measures that caused miner fatalities.

Because the amended complaint does not sufficiently establish a link between performance incentives and unsafe mining conditions and does not establish that Defendants had a

duty to disclose non-executive compensation, Defendants' motion to dismiss with regard to the Causes of Fatalities Statements is granted.

### 3. **Statements Concerning Seismicity at Driefontein**

Plaintiffs assert that Defendants made misleading statements made about the stability of the Driefontein mine in the days after the May 3, 2018 accident that tragically resulted in seven miner deaths. Specifically, Plaintiffs allege that Sibanye misled investors by stating on May 7, 2018, June 7, 2018, and June 20, 2018 that the May 3 accident could not have prevented or predicted the May 3, 2018 seismic event at Driefontein that led to the death of miners. *See* Am. Compl. ¶¶ 87, 89, 91, 93. Defendants' memorandum correctly notes that Plaintiffs do not cite any such statement by Sibanye. Def. Mem. 25. Plaintiffs allege that Defendants knew on the day of the accident (without stating the specific time that Defendants are alleged to have known) that the 7W Panel at the CL40-27 stope had a "6" seismic rating. Am. Compl. ¶¶ 92, 116. Defendants respond that the Plaintiffs do not assert that the risk rating of "6" was reached before the seismic event on May 3, 2018, but instead show that the "6" seismic rating occurred *after* the accident. Defendants assert that the seismic risk rating was "2" the day before, and the morning of, the May 3, 2018 seismic event, and was not recorded at "6" until the evening of May 3,

2018, due to the seismic event earlier that day. Def. Mem. 25;
Warnot Decl., Def. Ex. 15 at 651-52 (Masakhane Seismic Rating
May 3, 2018 to April 24, 2018); Warnot Decl., Def. Ex. 16 ¶¶ 5,
6 (Statement by Pinkie Clova Ndaba). Further, Defendants argue
that they did not misrepresent that Sibanye's seismic system is
not predictive of earthquakes, as earthquakes are by their
nature unpredictable, and that the safety of a mine is dependent
on a large number of factors, including the seismic system. *See*
Def. Mem. 26-27; Warnot Decl., Def. Ex. 21 at 417 (Driefontein
Mandatory Code of Practice to Combat Rock Fall and Rock Burst
Accidents in Tabular Metalliferous Mines). Plaintiffs argue that
Defendants' characterization of their statements is a factual
argument that must be decided by the factfinder. Defendants
respond that the lack of seismic predictability is not a factual
dispute and that Sibanye made no false statements about its
seismic system and support system. *Id.*; Pl. Opp. 23.

The court is not restricted to the amended complaint
in deciding this issue, because the underlying documents
referred to in the amended complaint "control and this Court
need not accept as true the allegations in the amended
complaint." *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F.
Supp. 2d 176, 193-94 (E.D.N.Y. 2010). First, though the amended
complaint alleges that the seismic rating was a "6" on "the day
of" the Accident, the "6" rating was, in fact, time stamped

52

"7:45 p.m.," under the Driefontein Accident had occurred. Am.
Compl. ¶¶ 92, 116; Warnot Decl., Def. Ex. 15 at 651 (Masakhane
Seismic Rating May 3, 2018 to April 24, 2018). Second, the sworn
statement of a Sibanye seismologist with knowledge of the events
explains that "[t]he area where the accident occurred was
classified as a 2 rating . . . at the time of the accident."
Warnot Decl., Def. Ex. 16 ¶ 5.6 (Statement by Pinkie Clova
Ndaba); *see* Def. Mem. 22. Plaintiffs fail to plead any other
particularized facts supporting their argument that Defendants'
statements were false, beyond Plaintiffs' incorrect reading of
the plain text of the Masakhane Seismic Rating chart. Warnot
Decl., Def. Ex. 15 (Masakhane Seismic Rating May 3, 2018 to
April 24, 2018). Consequently, Plaintiffs' mischaracterization
of the timing of the elevated seismic rating is fatal to their
claim.

Plaintiffs next argue that Sibanye's May 7, 2018 and
June 7, 2018 statements that the May 3 accident could not have
been prevented, were misleading because Sibanye allowed work to
continue in the 7W Panel at the CL40-27 stope when compliance
was only at 80%, and because the May Planning Report stated in a
"General" section of the meeting minutes under "Safety" that
"[a]ll red working places must be stopped and fixed."  Warnot
Decl., Def. Ex. 17 at 518 (Planning Minutes: May 2018 to Nov.

53

2018).[4] As the amended complaint alleges, however, the May Planning Report also specifically states that in the 7W Panel at the CL40-27 stope, where the May 3, 2018 Driefontein Accident occurred, a compliance rate of "less tha[n] 80%," not less than 92%, would have warranted stopping work and ameliorating the situation. *Id.* 532. The amended complaint alleges that the 7W Panel was rated 80% in the April 30 audit report. Am. Compl. ¶ 128. Therefore, the court finds that the amended complaint again is factually deficient to sustain Plaintiff's claim that Defendants were required to stop work in the 7W Panel, based on a compliance rate of 80%.

Moreover, Plaintiffs argue that Sibanye's management lowered operating standards in May 2018, and overrode Sibanye's policy mandating that red areas be stopped and fixed to make up for a production shortfall, thereby allowing a manager to prioritize productivity in alignment with Sibanye's incentive structure, which resulted in the miners' deaths. Pl. Opp. 24. This allegation is unsupported by any evidence. Because the claim that the May 7 and June 7 statements misled investors is based on a flawed allegation of the facts and an unsupported argument, as contradicted by Defendants' documents, Defendants'

---

[4]     Plaintiffs erroneously locate the citation at Warnot Decl., Def. Ex. 17 at 516 (Planning Minutes: May 2018 to Nov. 2018); the court has corrected the error. Pl. Opp. 24.

motion to dismiss is granted with regard to the claims based on seismic activity at the Driefontein mine.

## II.  Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "Scienter can be established ... by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. Conscious misbehavior or recklessness, in turn, can be established by showing, *inter alia*, that defendants knew facts or had access to information suggesting that their public statements were not accurate." *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) (quotations omitted). "[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quotations omitted). The relevant inquiry "is whether *all* of the facts alleged, taken

55

collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Slayton*, 604 F.3d at 774 (quoting *Tellabs, Inc.,* 551 U.S. at 322-23). Additionally, there is a "significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill v. GE,* 101 F.3d 263, 270 (2d Cir.1996).

The amended complaint chiefly relies on three accidents that occurred in 2018 to plead Defendants' scienter: (1) the Rustenburg Accident on March 24, 2018; (2) the Driefontein Accident on May 3, 2018; and (3) the Kloof Accident on June 11, 2018. Because the court has already found that Plaintiffs have failed to sufficiently allege plausible facts showing false or misleading statements on the part of Defendants, the court need not address the sufficiency of Plaintiffs' allegations of scienter.  Plaintiffs have not sufficiently alleged that Defendants knew or recklessly disregarded the truth about a material misrepresentation. Consequently, Defendants have failed to allege an inference of fraud that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs Inc. v. Makor Issues & Rights,* 551 U.S. 308, 324 (2007).

## III. Plaintiff's 20(a) Claim

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the

statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).  That is, "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012); *see also In re UBS Ag Secs. Litig.*, No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449, at *33 ("[I]ndividual defendants still must have actually 'made' the statements under the new *Janus* standard to be held liable under Section 10(b)."); *but see City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("[*Janus*] has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'").

Here, because Section 20(a) claims are "necessarily predicated on a primary violation of securities law," that Plaintiffs have failed to sufficiently allege, Plaintiffs'

control person claims against Mr. Froneman must also be dismissed. *Rombach*, 355 F.3d at 177–78.

## IV.   Loss Causation

Under the PSLRA, a plaintiff must plead loss causation. *See* 15 U.S.C. § 78u–4(b)(4). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) (citation omitted). To establish loss causation, "a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005) (quotations omitted). "[T]he vast majority of courts in this [Circuit] have required that [pleading] loss causation only meet the notice requirements of Rule 8." *Loreley,* 797 F.3d at 183 (*quoting Wilamowsky v. Take–Two Interactive Software, Inc.,* 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011)). Here, because Plaintiffs' amended complaint fails to sufficiently allege a fraudulent statement or omission made by or on behalf of Sibanye or Mr. Froneman for the reasons discussed above, *supra*, they necessarily fail to plead loss causation.

58

## V.    PSLRA's Particularity Requirement

Sibanye argues that Plaintiffs fail to plead their claims with sufficient particularity. As previously discussed, *supra*, a complaint must satisfy the PSLRA's particularity requirement to succeed on a Rule 10b-5 claim, including "demonstrat[ing] with specificity why and how each statement is materially false or misleading." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (quotations omitted). A complaint "marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false[ ] fails to state a claim.... [Plaintiff must] identif[y] statements and omissions, describe[ ] relevant predicate events, and allege[ ] how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 2020 WL 248729, at *5 (S.D.N.Y. Jan. 15, 2020) (quotations and citations omitted). The court has discussed, *supra,* the reasons why Plaintiffs' amended complaint fails to plead its claims with sufficient particularity, and does not reiterate them here.

## VI.  Plaintiffs' Request for Leave to Amend

"'[I]t is within the sound discretion of the district court to grant or deny leave to amend.'" *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "[W]here

amendment would be futile, denial of leave to amend is proper."
*Id.* at 140 (quotation marks omitted); *see Foman v. Davis,* 371
U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Where
"nothing in the record suggests that another complaint could
remedy the legal deficiencies," the district court does "not
abuse its discretion in failing to provide defendants with leave
to amend." *In re Liberty Tax, Inc. Sec. Litig.,* No. 20-652, 2020
WL 5807566, at *5 (2d Cir. Sept. 30, 2020). *See Horoshko v.
Citibank, N.A.,* 373 F.3d 248, 249 (2d Cir. 2004) ("[A]n
amendment is not warranted [a]bsent some indication as to what
appellants might add to their complaint in order to make it
viable." (quotation marks omitted)).

Here, Plaintiffs request leave to file a second
amended complaint, but offer no indication of what additional
facts would make their complaint viable and remedy its legal
deficiencies. Pl. Opp. 38-39. Plaintiffs have not advised the
court of any facts linking Sibanye's compensation structure to
the miner fatalities in 2018, or demonstrating that Sibanye was
aware from 2016 – 2018 that compensation was the true cause of
miner fatalities and created Sharp! as an illusory measure to
mislead investors. There is nothing in the record to suggest
that Plaintiffs will be able to remedy the legal deficiencies in

their complaint. Accordingly the court concludes that any amendment would be futile and denies Plaintiffs leave to amend.[5]

## VII. Rule 11 Inquiry

"The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'" *Rombach*, 355 F.3d at 178 (quoting 15 U.S.C. § 78u-4(c)(1)); *see also Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir. 1999) (noting that the PSLRA "functions . . . to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all"). Further, "if the court finds that any party or lawyer violated Rule 11(b), the PSLRA mandates the imposition of sanctions." *Rombach*, 355 F.3d at 178 (citing 15 U.S.C. § 78u-4(c)(2)).

Rule 11(b) pertains to parties' representations to the court, and provides in relevant part:

> By presenting to the court a pleading,
> written motion, or other paper--whether by
> signing, filing, submitting, or later
> advocating it--an attorney or unrepresented
> party certifies that to the best of the
> person's knowledge, information, and belief,

---

[5]     The court notes that during the premotion conference, Plaintiffs, who had a prior opportunity to investigate their claim, were afforded an opportunity to file a second amended complaint. May 31, 2019 Pre-Mot. Conf. Transcript, ECF No. 57 at 4-5. Plaintiffs declined to file a second amended complaint at the time, because Plaintiffs "believe[d] that the complaint, as [they] have currently pleaded it, on behalf of the lead plaintiffs in the class[,] suffices." *Id.*

formed after an inquiry reasonable under the
circumstances:
    (1)  it is not being presented for any
improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase
the cost of litigation;
    (2)  the claims, defenses, and other
legal contentions are warranted by existing
law or by a nonfrivolous argument for
extending, modifying, or reversing existing
law or for establishing new law;
    (3)  the factual contentions have
evidentiary support or, if specifically so
identified, will likely have evidentiary
support after a reasonable opportunity for
further investigation or discovery; and
    (4)  the denials of factual contentions
are warranted on the evidence or, if
specifically so identified, are reasonably
based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

Here, "the amended complaint fails to allege any material misstatements or omissions [and] does not adequately allege scienter..." *City of Taylor*, No. 12 Civ. 3553, 2013 U.S. Dist. LEXIS 120175, at *3. Nevertheless, Defendants have not asserted that Plaintiffs' submissions to the court have violated Rule 11(b), nor does this court find a violation, after considering the Rule 11(b) factors. Additionally, although the court dismisses Plaintiffs' complaint in its entirety, "[t]he operative question is whether [Plaintiffs'] argument[s] [are] frivolous, *i.e.*, the legal position[s] ha[ve] 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fishoff v. Coty Inc.*, 634

F.3d 647, 654 (2d Cir. 2011) (quoting *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)). The court finds that although Plaintiffs' conclusory allegations that Defendants made false and misleading statements are inadequate to state a claim, the allegations are not frivolous, despite lacking adequate factual support, and do not violate Fed. R. Civ. P. 11. The court grants Defendants' motion to dismiss, and respectfully directs the clerk to enter a judgment in favor of Defendants and close this case.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) is granted in its entirety. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and close this case.

**SO ORDERED.**

Dated:     November 10, 2020
           Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge
                              Eastern District of New York